Mary Jo O'Neill, AZ Bar #005924
Andrea G. Baran, MO Bar #46520
Meenoo Chahbazi, DC Bar #494651
Diana Chen, AZ Bar#021706
**EQUAL EMPLOYMENT OPPORTUNITY**
**COMMISSION, Phoenix District Office**
3300 N. Central Ave., Suite 690
Phoenix, Arizona  85012
Telephone: (602) 640-5061
Fax: (602) 640-5009
Email: mary.oneill@eeoc.gov
andrea.baran@eeoc.gov
meenoo.chahbazi@eeoc.gov
diana.chen@eeoc.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Equal Employment Opportunity Commission,<br><br>           Plaintiff,<br><br>     vs.<br><br>Creative Networks, L.L.C.,<br><br>           Defendant. | Case No. 09-cv-2023-SRB<br><br>**PLAINTIFF EQUAL EMPLOYMENT OPPORTUNITY COMMISSION'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**<br><br>**ORAL ARGUMENT REQUESTED** |

The Equal Employment Opportunity Commission alleges that Defendant Creative Networks violated Title I of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, when it (1) failed to provide sign language interpretation as a reasonable accommodation for deaf job applicants, including Rochelle Duran, during the

employment application process, (2) failed to hire Ms. Duran and other qualified, deaf job applicants because of their hearing impairments, and (3) by maintaining a policy limiting the accommodations it would provide to deaf job applicants that has the impact of excluding deaf job applicants from employment.  The facts in this case, particularly with respect to Ms. Duran and her efforts to get a job with Creative Networks, are undisputed and clearly establish the defendant's liability for these violations.  Creative Networks admits that Ms. Duran was a qualified applicant; that she was entitled to sign language interpreter services as a reasonable accommodation of her disability during the hiring process; that it refused to provide such services; that it failed to hire her because of her disability, and that its policy of denying accommodations to deaf job applicants was unreasonable.  Based on these undisputed facts, the EEOC moves this Court pursuant to Rule 56(c) of the Federal Rules of Civil Procedure to grant partial summary judgment against Creative Networks and to find Creative Networks liable for failing to provide reasonable accommodations to Ms. Duran, for failing to hire Ms. Duran, and for maintaining an unlawful policy that denies reasonable accommodations to deaf job applicants.

I.     **FACTUAL BACKGROUND**

In April 2005, Rochelle Duran applied for a position as a Direct Support Professional (DSP) with defendant Creative Networks.  **PSF 28.**[1]  Ms. Duran has had severe hearing los since childhood and has a specific diagnosis of severe to profound

---

[1] Plaintiff's facts are referred to as "PSF."

sensorineural hearing loss. **PSF 4–7.** Ms. Duran communicates with both hearing and deaf people in a variety of ways, including lip-reading, vocalizing, and by using American Sign Language (ASL). Ms. Duran functions well with lip-reading and vocalizing when communicating one-on-one in quiet settings, but she requires sign language interpretation in group settings because of the difficulties posed by the presence of multiple speakers, particularly in classroom situations. **PSF 21.**

Despite her disability, Ms. Duran is a productive member of society and has been employed for most of her adult life. At the time she applied for the DSP position, she had over twenty years of experience working with disabled people, and she was well-qualified for a DSP position, which involves providing attendant care, housekeeping, personal care, habilitation, and personal care services to disabled clients in their homes. **PSF 10–11; 13**. These duties were substantially equivalent to those Ms. Duran performed in her previous jobs, and it is undisputed that Ms. Duran was qualified to work as a DSP for Creative Networks. **PSF 12–16.**

Ms. Duran began her application process with Creative Networks on or around April 6, 2005, when she placed a call to the company's staff development department. **PSF 17–18.** Her call was answered by Rosemary Padilla, a Staff Development Administrative Assistant. **PSF 17–18.** Because Ms. Duran is deaf, she and Ms. Padilla used an "IP Relay" system that uses a third-party translator to interpret the call. Ms. Padilla told Ms. Duran that Creative Networks's application process required her to complete a pre-employment orientation, which she scheduled Ms. Duran to attend on or around April 12. **PSF 20.** Ms. Duran asked Ms. Padilla for ASL interpreter services to

3

be provided at the orientation, and Ms. Padilla responded that the company would not provide an interpreter at the orientation, but that the orientation would primarily involve paperwork. **PSF 19–20.**

When Ms. Duran arrived at the orientation program, it was in a group setting and the instructor was verbally providing important information relating to the job and the application process. *See* **PSF 21.** Lacking a sign language interpreter, Ms. Duran was not able to understand much of the material presented by the instructor. **PSF 21.** After the orientation, Ms. Duran received a call from Eva Sankey, another Staff Development Administrative Assistant, who told her that she had reviewed her application for employment and that she wanted her to come in for pre-employment training. **PSF 23.** Ms. Duran told Ms. Sankey that she would need a sign language interpreter for the training. **PSF 24.** Ms. Sankey told Ms. Duran that she would need to talk to her supervisor, but that Ms. Duran would have to find her own interpreter and that Creative Networks would pay up to $200 for interpreter services at the training. **PSF 25.** Ms. Duran responded that Creative Networks should obtain an interpreting agency and she referred Ms. Sankey to one she was familiar with. **PSF 26.** Ms. Sankey said that she would look into it and gave Ms. Duran the dates and times for the training, which was twenty-four hours of training spread over six days. **PSF 27.**

Over the next couple of weeks, Ms. Duran had additional conversations with Creative Networks representatives, including Ms. Sankey, regarding her request for sign language interpretation. Ms. Sankey repeatedly told Ms. Duran that the company's policy was to provide only $200 worth of interpreter services for the training program.

4

**PSF 39; 41.** Ms. Duran told Ms. Sankey that $200 would be insufficient to provide interpreter services for the entire twenty-four hours of training. **PSF 37; 38; 40.** Ms. Sankey told Ms. Duran that she could still participate in the training but that Ms. Duran would have to find someone, perhaps a friend or family member, to interpret for her. **PSF 25; 31; 39.** Ms. Duran explained that this would not work for her because that she did not have any friends or family who could interpret for her. **PSF 42.** During these conversations, Ms. Duran again suggested that Creative Networks contact Finger Works, a professional interpreter service, to obtain more information regarding these types of services. **PSF 26; 32–33.** Ms. Sankey did contact Michelle Caplette, the owner of Finger Works , who explained the company's responsibility to provide ASL interpreter services as a reasonable accommodation under the ADA. **PSF 35–36.**

While Ms. Duran was having repeated conversations with Ms. Padilla and Ms. Sankey, her request for ASL interpretation was communicated to higher-level managers, including Supervisor Jennifer Hardin and Director of Operations Megan Neal. **PSF 28-29.** But the managers refused to grant Ms. Duran's request, citing their $200 policy and disregarding the fact that Ms. Duran had no other means of obtaining ASL interpretation for the training. **PSF 49.** During Ms. Duran's last conversation with Creative Networks, Ms. Sankey told her again that the company's policy was to provide only $200 for ASL interpreters and that she needed to ask a friend or family member to interpret for her because they would not provide interpreter services for the entire training. **PSF 37–41.** Because Creative Networks refused to alter its policy and provide more that $200 worth

of ASL interpretation services for Ms. Duran's training, she was not able to attend the training and Creative Networks ultimately failed to hire her. **PSF 45.**

## II.  SUMMARY JUDGMENT STANDARD

A summary judgment motion may be granted where there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The test for determining the presence or absence of a genuine issue of material fact is whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Merrick v. Northern Natural Gas Co.*, 911 F.2d 426, 429 (10th Cir. 1990).  "Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Once the movant carries its initial burden, a nonmovant can defeat a motion for summary judgment only by demonstrating the existence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.").  A "mere scintilla of evidence" in support of the non-moving party will not defeat summary judgment; rather, "there must be evidence on which the jury could reasonably find" for the nonmovant. *Anderson*, 477 U.S. at 252; *see also Nelson v. Pima Comm. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) (citing *Witherow v. Paff*, 52 F.3d 264, 266 (9th Cir. 1995))

("mere allegation and speculation do not create a factual dispute for purposes of summary judgment").

In this case, the undisputed facts establish that Creative Networks failed to provide reasonable accommodations to a disabled job applicant, Ms. Duran; that it failed to hire Ms. Duran as a direct result of its failure to accommodate her and because of her disability; and that it maintained an unlawful policy denying reasonable accommodations to deaf job applicants. In the absence of any factual dispute on these issues, summary judgment must be granted.[2]

### III.   SUMMARY JUDGMENT ON THE EEOC'S CLAIMS IS APPROPRIATE.

#### A.   Creative Networks Violated the ADA by Failing to Provide a Reasonable Accommodation to Ms. Duran.

To establish failure to accommodate under the ADA, the EEOC must show that (1) Ms. Duran was disabled within the meaning of the ADA; (2) Ms. Duran is otherwise qualified for the job; and (3) Creative Networks failed to provide a reasonable accommodation to Ms. Duran. 42 U.S.C. §§ 12112(b)(5)(A), (B), & 12111(8); *see also Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1133 (9th Cir. 2001). Because Creative Networks admits each of these three elements, the EEOC is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 323.

---

[2] Though Defendant initially claimed that this action was barred by the applicable statute of limitations and/or a failure to timely pursue and exhaust administrative or statutory remedies, there are no facts that support this defense. Dkt. 16, 3–4. Ms. Duran applied with Creative Networks in April 2005 and filed a charge of discrimination with the EEOC in May 2005, well within the 300 day filing period permitted by the ADA. **42 U.S.C. § 12117(a); 42 U.S.C. § 2000e-5(e)(1).**

### 1.  Ms. Duran is a Disabled Within the Meaning of the ADA.

The ADA defines a disability as "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A); 29 C.F.R. § 1630.2(g); *see also* 42 U.S.C. § 12102(2)(A) (including hearing in a list of major life activities).  Prior to the ADA Amendments Act of 2008 (ADAAA),[3] whether a limitation was "substantial depend[ed] on the following factors:  (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or expected permanent or long term impact of or resulting from the impairment."  29 C.F.R. § 1630.2(j)(2).  In this case, Ms. Duran had a physical impairment that substantially limits the major life activity of hearing.  **PSF 8.**  Since she was born, Ms. Duran experienced hearing impairment and was diagnosed with severe hearing loss bilaterally at the age of twelve.  **PSF 3; 5.**  At the time Ms. Duran applied for employment with Creative Networks, she had been diagnosed with severe to profound sensory-neural hearing loss.  **PSF 6; 22.**  Her hearing impairment is severe; it is permanent and has affected her hearing since birth, and Creative Networks does not dispute that Ms. Duran has a disability as defined by the ADA.  **PSF 2-8.**

---

[3] The ADA Amendments Act of 2008 (ADAAA) made significant changes to the definition of disability under the ADA.  *Rohr v. Salt River Project Agricultural Imp. & Power Dist.*, 555 F.3d 850, 860–62 (9th Cir. 2009).  However, the ADAAA took effect in 2009, and the Ninth Circuit has determined that the ADAAA should not be applied retroactively.  *Becerril v. Pima County Assessor's Office*, 587 F.3d 1162 (9th Cir. 2009).  As a result, the pre-ADAAA definition of disability governs the EEOC's claims regarding Ms. Duran.

## 2. Ms. Duran Was Otherwise Qualified For a DSP Job.

Despite her disability, Ms. Duran was fully qualified for the DSP position. The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The term "essential functions" refers to the "fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). It does not "include the marginal functions of the position." *Id.* The complainant must also "'satisf[y] the requisite skill, experience, education and other job-related requirements of the position.'" *Rohr*, 555 F.3d at 862 (quoting *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 990 (9th Cir. 2007) (en banc)).

Creative Networks's DSPs provide in-home non-medical services to disabled clients. **PSF 10.** Such services include personal care services, housekeeping, personal hygiene, and respite care, among others. **PSF 11.** Ms. Duran has over twenty years of experience in providing similar services to customers with a wide variety of disabilities. **PSF 113–15.** Ms. Duran was capable of performing all of the functions required of a DSP. **PSF 16.** Moreover, Defendant admits that Ms. Duran was qualified for the DSP position. **PSF 12.** Thus, there is no material factual dispute that at the time she applied for the DSP position with Defendant, Ms. Duran was a qualified individual with a disability under the ADA and was therefore entitled to its protections.

### 3. Creative Networks Refused to Reasonably Accommodate Ms. Duran During the Hiring Process.

The ADA requires employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant . . ." 42 U.S.C. § 12112(b)(5)(A). The burden is on the employer to initiate an interactive process once it becomes aware that a job applicant may require reasonable accommodation. *Zivkovic v. So. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002) (citing *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1112 (9th Cir. 2000) (en banc), *vacated on other grounds, U.S. Airways, Inc., v. Barnett*, 535 U.S. 391 (2002)); 29 C.F.R. § 1630.2(o)(3). Reasonable accommodations may include "the provision of qualified readers or interpreters," but is not limited to these services. 29 C.F.R. § 1630.2(o)(2).

In this case, Creative Networks knew that Ms. Duran needed a qualified sign language interpreter during the orientation and training program that were part of the company's hiring process. Witness testimony and documentary evidence establish that Ms. Duran requested an ASL interpreter for both the pre-employment orientation and the training as an accommodation for her hearing impairment. *See, e.g.,* **PSF 19; 24; 30; 37.** There is no dispute that Ms. Duran requested an accommodation.

It is also undisputed that the accommodation Ms. Duran requested was reasonable. While the "reasonableness of an accommodation is ordinarily a question of fact," *Lujan v. Pac. Maritime Ass'n*, 165 F.3d 738, 743 (9th Cir. 1999) (citation omitted), summary judgment is appropriate on this question when "there is no factual dispute for the jury to resolve." *Schmidt v. Safeway Inc.*, 864 F.Supp. 991, 997 (D. Or. 1994). In this case,

Creative Networks has admitted that the accommodation Ms. Duran requested, sign language interpretation, was reasonable. **PSF 52.**  Creative Networks has further admitted that it could have provided Ms. Duran with an ASL interpreter as she requested, that it would not have posed an undue hardship, and that there was no reason it could not have done so. **PSF 49–50, 53-57.**  Given Defendant's admissions, there is no genuine issue of fact as to whether the provision of an ASL interpreter for Defendant's pre-employment orientation and training was a reasonable accommodation.

### B. Creative Networks Violated the ADA When it Failed to Hire Ms. Duran Because of the Expense It Would Have Incurred in Making Reasonable Accommodations For Her.

To establish a failure to hire claim under the ADA, the EEOC must demonstrate that (1) Ms. Duran was disabled within the meaning of the ADA; (2) Ms. Duran is otherwise qualified for the job for which she applied; and (3) that Creative Networks failed to hire Ms. Duran because of her disability.  *See Humphrey*, 239 F.3d at 1133; *see also Cooper v. Neiman Marcus Group*, 125 F.3d 786, 790 (9th Cir. 1997).  The ADA also precludes employers from denying employment opportunities to qualified job applicants with disabilities based on the need to make reasonable accommodations.  *See* 42 U.S.C. § 12112 (a), (b)(5)(B); 29 C.F.R. § 1630.9; *see also Zivkovic*, 302 F.3d at 1090 (if "interviews were conducted in a discriminatory manner without providing a reasonable accommodation, the interviewers' non-selection of [plaintiff] would not be appropriate").  In this case, Creative Networks violated the ADA by refusing to hire Ms. Duran due to the cost of her reasonable accommodation.

11

As explained above, Ms. Duran is a qualified individual with a disability within the meaning of the ADA. And it is undisputed that Creative Networks did not hire Ms. Duran because it would have cost more than $200 to provide sign language interpreter services at the company's pre-employment training program. **PSF 45.** Ms. Sankey told Ms. Duran that she could be scheduled for the training only if she found a friend or family member to attend with her to interpret. **PSF 39.** Moreover, Defendant's refusal to reasonably accommodate Ms. Duran rendered her ineligible for hire, as it prevented her from attending and passing Defendant's mandatory training program. **PSF 18; 39.** Because there is no genuine issue of material fact on this matter, the EEOC is entitled to summary judgment on this claim.

### C. **Creative Networks's $200 Policy Limiting Sign Language Interpreter Services is Unlawful Under the ADA.**

Defendant's policy of limiting accommodations for deaf or hearing-impaired applicants to $200 for its pre-employment training program (and of refusing to provide accommodations for orientation at all) is a *per se* violation of the ADA because it is a blanket exclusion of a reasonable accommodation and does not allow a case-by-case assessment of an individual's disability. *McGregor v. Nat'l R.R. Passenger Corp.*, 187 F.3d 113, 1115–16 (9th Cir. 1999); *Norris v. Allied-Sysco Food Servs., Inc.*, 948 F.Supp. 1418, 1437 (N.D. Cal. 1996); *Heise v. Genuine Parts Co.*, 900 F.Supp. 1137, 1154 & n.10 (D.Minn. 1995) (holding that a "must be cured" or "100% healed" policy is a *per se* violation of the ADA because the policy does not allow a case-by-case assessment of an individual's ability to perform essential functions of the individual's job, with or without

accommodation); *Hutchinson v. UPS*, 883 F.Supp. 379, 397 (N.D. Iowa 1995) (finding that defendant's "100% healed" policy would be a *per se* violation of the ADA because it did "not make an individual assessment of an individual's ability to perform the essential functions of the person's job with or without accommodation"). The ADA requires a case-by case assessment of disabilities and does not permit blanket exclusions. *Bombrys v. City of Toledo*, 849 F.Supp. 1210, 1216 (N.D. Ohio 1993) (citing *Anderson v. Little League Baseball, Inc.*, 794 F.Supp. 342, 345 (D. Ariz. 1992) ("Courts have interpreted the Americans with Disabilities Act to require a case-by-case analysis of disabled persons and the jobs they desire to obtain.")); *see also Sarsycki v. UPS,* 862 F.Supp. 336, 341–41 (W.D. Okla. 1994) (mem. op.) (finding that employer could not rely on a direct threat defense in the absence of "an individualized assessment of [plaintiff's] abilities" prior to taking adverse action against him).

Company directors Megan Neal and Ron Cornelison set the policy limiting sign language interpreter services to $200, knowing that the actual cost of providing interpreter services for the training and orientation would cost thousands of dollars and that this policy would effectively deny deaf applicants a reasonable accommodation. **PSF 47, 48,** *see also* **PSF 50; 53–57.** The policy also effectively precluded any individualized assessment of applicants' disabilities or accommodation needs. *See Heise*, 900 F.Supp. at 1154 & n.10. Ms. Neal and Mr. Cornelison both admit that this policy was unreasonable. **PSF 46; 49; 51.** Ms. Neal and Mr. Cornelison also both admit that providing sign language interpreter services for Ms. Duran would have been a reasonable accommodation. **PSF 50, 52.** Moreover, Creative Networks has stipulated that providing

13

sign language interpreter services to deaf job applicants during orientation and pre-employment training would not have posed an undue hardship to the company. **PSF 53-57.**

Creative Networks's policy is blatantly inconsistent with its obligation under the ADA to engage in the interactive process. An employer's repeated insistence on a dollar limit for a specific accommodation cannot be fairly termed a "consideration of the employee's request," nor is it a good faith exploration of the possible accommodations that could be made. *Zivkovic*, 302 F.3d at 1089 (citations omitted). Because the policy effectively eliminates the interactive process envisioned by the ADA, precludes the case-by-case examination of applicants' disabilities and accommodation needs, and prevents qualified individuals with disabilities from receiving reasonable accommodations that Creative Networks is capable of providing without undue hardship, it is a per se violation of the ADA. Therefore, the EEOC is entitled to summary judgment on this claim and requests that this Court grant a permanent injunction enjoining Defendant from engaging in disability discrimination and any other employment practice which discriminates on the basis of disability.

## IV. CONCLUSION

It is undisputed that Creative Networks failed to provide reasonable accommodations to the known physical disabilities of Ms. Duran, a qualified individual with a disability, and that Creative Networks then refused to hire her because of her need for reasonable accommodation. These undisputed facts entitle the EEOC to summary judgment on its failure to accommodate and failure to hire claims for Ms. Duran.

Moreover, it is undisputed that Creative Networks established a policy strictly limiting sign language interpreter services during the employment application process, without regard to an individualized assessment of need and even though providing such services would not impose an undue hardship on the company. Because this policy violates the ADA as a matter of law, the EEOC is entitled to summary judgment on this third claim as well. The EEOC respectfully urges this Court to grant this motion.

DATED this 14th day of January, 2011.

MARY JO O'NEILL
Regional Attorney

ANDREA G. BARAN
Supervisory Trial Attorney

s/ Meenoo Chahbazi
MEENOO CHAHBAZI
Trial Attorney

DIANA CHEN
Trial Attorney

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

Attorneys for Plaintiff

## **CERTIFICATE OF SERVICE**

I certify that on this 14th day of January, 2010, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

James L. Blair
N. Todd McKay
RENAUD COOK DRURY MESAROS, PA
One North Central, Suite 900
Phoenix, Arizona 85004-4417

*Attorneys for Creative Networks, LLC*

<u>s/ Meenoo Chahbazi</u>
Attorney for Plaintiff