IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| EQUAL EMPLOYMENT | ) | CV. NO.  09-02023 DAE |
| OPPORTUNITY COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CREATIVE NETWORKS, L.L.C., | ) | |
| an Arizona corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

ORDER: (1) GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AND (2) DENYING DEFENDANT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT

On May 18, 2012, the Court held a hearing on Plaintiff's Motion for

Partial Summary Judgment (doc. # 124) and Defendant's Motion for Partial

Summary Judgment (doc. # 126).  Meenoo Chahbazi, Esq., Hillary K. Valderrama,

Esq., and Mary Jo O'Neill, Esq., appeared at the hearing on behalf of Plaintiff

Equal Employment Opportunity Commission (the "EEOC"); N. Todd McKay,

Esq., appeared at the hearing on behalf of Defendant Creative Networks, L.L.C.

("Creative Networks").  After reviewing the motions and the supporting and

opposing memoranda, the Court GRANTS Plaintiff's Motion for Partial Summary

Judgment and DENIES Defendant's Motion for Partial Summary Judgment.

<u>BACKGROUND</u>

I.    <u>Factual Background</u>

This case arises out of allegations of discrimination against disabled individuals in violation of Title I and Title V of the Americans with Disabilities Act of 1990 (the "ADA") and Title I of the Civil Rights Act of 1991. Rochelle Duran ("Duran") has experienced hearing impairment since she was born ("Duran Depo.," Doc. # 125-2 at 8:8–9), and was diagnosed with "severe [hearing] loss bilaterally" when she was 12 years old ("Muller Report," Doc. # 125-3 at 7). In 2005, she was diagnosed with "severe to profound sensory-neural hearing loss." (Doc. # 125-4.) On or about April 6, 2005, Duran contacted Creative Networks to apply for a Direct Support Professional position. (Duran Depo. at 561:11–23; "Def's Initial Discl.," Doc. # 125-15 at 2.) Rosemary Padilla ("Padilla"), a Staff Development Administrative Assistant at Creative Networks, informed Duran that she would be required to complete orientation and pre-employment training as part of the application process. ("EEOC SOF," Doc. # 125 ¶ 18; "CN CASF," Doc. # 131 ¶ 18; Doc. # 25-15 at 2.) According to Duran, she requested an interpreter for the orientation and was told that Creative Networks would not provide an interpreter for the orientation but that it would provide an interpreter for training. (Duran Depo. at 63:18–25.) Duran states that when she arrived at the orientation,

an instructor verbally provided information to a group of applicants, and she was unable to understand most of what was said.  (Id. at 64:1–7.)

The parties do not dispute that Duran completed a written job application at or around the time of the orientation, and that Eva Sankey ("Sankey"), another Staff Development Administrative Assistant, called Duran to inform her that Sankey had reviewed her employment application and that she wanted Duran to come in for pre-employment training.  (EEOC SOF ¶¶ 22–23; CN CASF ¶¶ 22–23.)  Duran told Sankey that she would need a sign language interpreter for the training, and Sankey responded that she would need to talk to her supervisor, but that Duran would have to find her own interpreter and that Creative Networks would pay up to $200 for interpreter services.  (EEOC SOF ¶¶ 24–25; CN CASF ¶¶ 24–25.)  Duran responded that Creative Networks should find and obtain an interpreting agency, but that she could refer Creative Networks to an interpreting agency.  (EEOC SOF ¶ 26; CN CASF ¶ 26.)  Sankey stated that she would look into it and gave Duran the dates and times for the training, which was twenty-four hours of training spread over six days.  (EEOC SOF ¶ 27; CN CASF ¶ 27.)

Jennifer Hardin ("Hardin"), a Creative Networks supervisor, spoke to the Director of Operations, Megan Neal ("Neal"), about Duran's request for a sign

language interpreter, and Neal stated that Creative Networks would provide $200 toward the cost of sign language interpretation for Duran's training only.  (EEOC SOF ¶ 29; CN CASF ¶ 29; "Hardin Depo," Doc. 125-13, 26:5–28:13.)

In another conversation between Duran and Sankey, Duran again requested that Creative Networks provide her with an interpreter for training. (EEOC SOF ¶ 30; CN CASF ¶ 30.)  Sankey responded that Duran had to find her own interpreters, and Duran stated again that it was the responsibility of Creative Networks to provide an interpreter.  (EEOC SOF ¶ 31; CN CASF ¶ 31.)  Duran stated that she had contacted an interpreting agency and that a Michelle Caplette ("Caplette") from the agency indicated that Caplette had contacted Creative Networks.  (EEOC SOF ¶ 32; CN CASF ¶ 32.)  Duran suggested that Creative Networks contact and negotiate with Caplette, and Sankey agreed to call the agency and inform Duran of the result.  (EEOC SOF ¶¶ 33–34; CN CASF ¶¶ 33–34.)

In the third and last phone conversation with Sankey, Duran explained that she wanted to attend the training, but that $200 would not be enough to pay for sign language interpreter services for the training period.  (EEOC SOF ¶ 37, CN CASF ¶ 37.)  Sankey responded that it was Creative Networks' policy to provide only $200 toward interpreting services for the training and that, if Duran had a

4

friend or family member to help her, she could be scheduled for the training.
(EEOC SOF ¶ 39; CN CASF ¶ 39; Doc. 125-19 at EEOC-CND-00024.)  Duran
stated that $200 would not cover interpreting for one night of training, and that a
certified interpreter would be more appropriate than a friend or family member;
Sankey repeated that it was company policy to provide up to $200.  (EEOC SOF
¶¶ 40–41; CN CASF ¶¶ 40–41; Doc. 125-19 at EEOC-CND-00024.)  Duran then
stated that she did not know what to say and added that she did not have anyone to
help translate for her.  (EEOC SOF ¶ 42; CN CASF ¶ 42; Doc. 125-19 at EEOC-
CND-00024.)  At some point, Sankey said "ok" and appeared to conclude the call.
(EEOC SOF ¶ 43; CN CASF ¶ 43; Doc. 125-19 at EEOC-CND-00024.)  Creative
Networks then placed Duran's application in its inactive files.  (EEOC ¶ 44; CN
CASF ¶ 44.)

        In May 2005, Duran filed a Charge of Discrimination against Creative
Networks, alleging that she was denied a reasonable accommodation during the
orientation and training.  (Doc. # 127-1 at 2, EEOC-CND-00008.)  About three
years later, on April 25, 2008, the EEOC issued a determination that there is
reasonable cause to believe Creative Networks violated the ADA in having a
policy or practice that denied Duran "and a class of similarly situated individuals a
reasonable accommodation and denied the class employment because of their

disabilities."  (Doc. # 127-1 at 4–5, EEOC-CND-00013–14.)

II.   Procedural Background

On September 28, 2009, the EEOC filed a Complaint against Creative Networks pursuant to Title I and Title V of the ADA and Title I of the Civil Rights Act of 1991.  (Doc. # 1.)  The EEOC brought this lawsuit "to correct unlawful employment practices on the basis of disability and to provide appropriate relief to Rochelle Duran . . . and a class of similarly situated individuals who were adversely affected by such practices."  (Id. at 1.)  The EEOC asserts that, since at least 2005, Creative Networks has required applicants for the position of Caregiver, Caretaker, and/or Direct Support Professional to complete twenty-four or more hours of pre-employment orientation and training.  (Id. ¶ 11.)The EEOC asserts that, since this same time, Creative Networks has had a "policy or practice of denying accommodations costing greater than $200 for interpreting services for hearing impaired applicants," such as Duran, to complete this training.  (Id. ¶ 12.)

As a result, the EEOC contends that Creative Networks has engaged in unlawful employment practices including:

A.   Failure to reasonably accommodate and failure to hire . . . Duran and the class because of [Creative Networks'] rigid policy or practice of limiting accommodations to $200

B.   Failure to hire . . . Duran and a class of similarly situated individuals because of their disability, hearing impairment

    C.      Maintaining a policy that is a per se violation of the ADA and has the impact of not hiring or excluding hearing impaired applicants.

(Id. ¶ 13.)

        In its Prayer for Relief, the EEOC seeks, inter alia:  a permanent injunction enjoining Creative Networks from engaging in disability discrimination; an order requiring Creative Networks to institute and carry out policies and practices that provide equal employment opportunities for qualified individuals with disabilities; an order requiring Creative Networks to provide Duran and a class of similarly situated individuals with backpay, compensation for past and future pecuniary and non-pecuniary losses resulting from the alleged unlawful practices; and punitive damages.  (Id. at 5–6.)

        On January 14, 2011, the EEOC filed a Motion for Partial Summary Judgment on its failure to hire and failure to accommodate claims for Duran and on its claim that the alleged policy limiting sign language interpreter services to $200 is unlawful.  (Doc. # 100.)  On February 16, 2011, Creative Networks filed a request that the Court deny the Motion for Partial Summary Judgment without prejudice pursuant to Federal Rules of Civil Procedure ("Rule") 56(d) (the "Rule 56(d) Request") on the basis that the parties require more time to conduct "class discovery."  ("Rule 56(d) Req.," Doc. # 105.)

On April 8, 2011, the Court granted Creative Networks' Rule 56(d) Request and denied without prejudice the EEOC's Motion for Partial Summary Judgment.  (Doc. # 112.)  The Court found that the EEOC's Motion for Partial Summary Judgment was premature because the names of six class members had only been recently disclosed as a result of a delayed mailing to prior applicants to identify potential class members.  (Id. at 4, 6–7.)

On November 30, 2011, the EEOC filed a Notice of Non-Issues Concerning Class Claims, in which the EEOC advised the Court that it no longer seeks monetary relief on behalf of a class of victims in the case.  (Doc. # 123.)  The EEOC stated that it continues to seek monetary relief on behalf of Duran and "injunctive relief relevant to all claims set forth in the Commission's Complaint." (Id. at 1.)   The EEOC also stated that it advised Creative Networks that it continues to list as witnesses individuals previously identified as class members. (Id. at 1–2.)

On December 8, 2011, the EEOC filed the instant Motion for Partial Summary Judgment.  ("EEOC Mot.," Doc. # 124.)  The EEOC also filed a Statement of Facts in support of its motion.  ("EEOC SOF," Doc. # 125.)  On January 19, 2012, Creative Networks filed a Response to Plaintiff's Motion for Partial Summary Judgment ("CN Response," Doc. # 130) and a Controverting, and

Additional Statement of Facts ("CN CASF," Doc. # 131).  On February 16, 2012, the EEOC filed a Reply to Defendant's Response to Motion for Partial Summary Judgment.  ("EEOC Reply," Doc. # 137.)

On December 9, 2011, Creative Networks filed the instant Motion for Partial Summary Judgment.  ("CN Mot.," Doc. # 126.)  Creative Networks also filed a Separate Statement of Facts in support of its motion. ("CN SSOF," Doc. # 127.)  On January 19, 2012, the EEOC filed a Response to Defendant's Motion for Partial Summary Judgment ("EEOC Resp.," Doc. # 132) and a Response to Defendant's Statement of Facts (Doc. # 133).  On February 16, 2012, Creative Networks filed a Reply to Plaintiff's Response to Motion for Partial Summary Judgment.  ("CN Reply," Doc. # 138.)

At the May 18, 2012 hearing, the Court requested supplemental briefing from the parties regarding the purpose of the EEOC's claim that Creative Networks maintained a policy that is a per se violation of the ADA and has the impact of not hiring or excluding hearing impaired applicants.  On May 29, 2012, the EEOC filed its supplemental brief.  (Doc. # 144.)  On June 4, 2012, Creative Networks filed a responding brief.  (Doc. # 145.)

STANDARD OF REVIEW

Summary judgment is granted under Federal Rule of Civil Procedure

9

56 when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Porter v. Cal. Dep't of Corr., 419 F.3d 885, 891 (9th Cir. 2005); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000). A main purpose of summary judgment is to dispose of factually unsupported claims and defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986).

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial. See id. at 323. Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. Id. at 322–23. A moving party without the ultimate burden of persuasion at trial—usually, but not always, the defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000). "A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th

Cir. 2007) (citing <u>Celotex Corp.</u>, 477 U.S. at 323).

Once the moving party has carried its burden under Rule 56, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial" and may not rely on the mere allegations in the pleadings. <u>Porter</u>, 419 F.3d at 891 (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986)). In setting forth "specific facts," the nonmoving party may not meet its burden on a summary judgment motion by making general references to evidence without page or line numbers. <u>S. Cal. Gas Co. v. City of Santa Ana</u>, 336 F.3d 885, 889 (9th Cir. 2003). "[A]t least some 'significant probative evidence'" must be produced. <u>T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9ith Cir. 1987) (quoting <u>First Nat'l Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 290 (1968)). "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." <u>Addisu</u>, 198 F.3d at 1134. Further, the Ninth Circuit has "refused to find a 'genuine issue' where the only evidence presented is 'uncorroborated and self-serving' testimony." <u>Villiarimo v. Aloha Island Air, Inc.</u>, 281 F.3d 1054, 1061 (9th Cir. 2002) (citing <u>Kennedy v. Applause, Inc.</u>, 90 F.3d 1477, 1481 (9th Cir. 1996)). "Conclusory allegations unsupported by factual data cannot defeat summary judgment." <u>Rivera v. Nat'l R.R. Passenger Corp.</u>, 331 F.3d 1074, 1078

11

(9th Cir. 2003).

When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." T.W. Elec. Serv., 809 F.2d at 631.  In other words, evidence and inferences must be construed in the light most favorable to the nonmoving party.  Porter, 419 F.3d at 891.  The court does not make credibility determinations or weigh conflicting evidence at the summary judgment stage.  Id.; see also Nelson v. City of Davis, 571 F.3d 924 (9th Cir. 2009) ("[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.") (citations omitted).  However, inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party.  T.W. Elec. Serv., 809 F.2d at 631.

<u>DISCUSSION</u>

The EEOC seeks partial summary judgment on its claims that Creative Networks violated Title I of the ADA when it allegedly failed to provide sign language interpretation as a reasonable accommodation to Duran and when it failed to hire Duran.  (EEOC Mot. at 1.)

Creative Networks seeks partial summary judgment against (1) the EEOC's allegations and claims for relief on behalf of "an alleged class of similarly situated individuals," and (2) the EEOC's claims for injunctive relief.

I.      The EEOC's Motion for Partial Summary Judgment

Title I of the ADA prohibits "discriminat[ion] against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring . . . of employees, . . . job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a) (2005).[1] Under the ADA, the term "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  42 U.S.C. § 12112(b)(5)(A).

A.      Failure to Provide Reasonable Accommodation

To establish a prima facie case under the ADA that Creative Networks

---

[1]  The ADA Amendments Act of 2008 ("ADAAA") took effect in 2009. However, the Ninth Circuit has concluded that the ADAAA is not retroactive. Becerril v. Pima Cnty. Assessor's Office, 587 F.3d 1162, 1164 (9th Cir.2009) (per curiam).  Therefore, the Court analyzes the EEOC's claims in accordance with the ADA standards in effect prior to the passage of the ADAAA.

failed to accommodate Duran's disability requires demonstrating:  "(1) [s]he is

disabled within the meaning of the ADA; (2) [s]he is a qualified individual able to

perform the essential functions of the job with reasonable accommodation; and (3)

[s]he suffered an adverse employment action because of [her] disability."  Allen v.

Pac. Bell, 348 F.3d 1113, 1114 (9th Cir. 2003) (citing Nunes v. Wal-Mart Stores,

Inc., 164 F.3d 1243, 1246 (9th Cir. 1999)).  The ADA defines "qualified individual

with a disability" as "an individual with a disability who, with or without

reasonable accommodation, can perform the essential functions of the employment

position that such individual holds or desires." 42 U.S.C. § 12111(8).

          "Once an employer becomes aware of the need for accommodation,

that employer has a mandatory obligation under the ADA to engage in an

interactive process with the employee to identify and implement appropriate

reasonable accommodations."  Humphrey v. Mem'l Hosps. Ass'n, 239 F.3d 1128,

1137 (9th Cir. 2001) (citing Barnett v. U.S. Air, 228 F.3d 1105, 1114 (9th Cir.

2000)).  "The interactive process requires communication and good-faith

exploration of possible accommodations between employers and individual

employees, and neither side can delay or obstruct the process."  Id. (citing Barnett,

228 F.3d at 1114–15).  "Employers, who fail to engage in the interactive process in

good faith, face liability for the remedies imposed by the statute if a reasonable

accommodation would have been possible." Id. at 1137–38 (citing Barnett, 228 F.3d at 1116).

Creative Networks does not dispute that Duran is disabled or that she was qualified for the Direct Support Professional position in April and May 2005 when she applied for the position.  (EEOC SOF ¶¶ 2, 8, 12; CN CASF ¶¶ 2, 8, 12.) Creative Networks also does not dispute that Duran told Sankey that she needed a sign language interpreter for training, or that Sankey responded that Creative Networks would provide only $200 toward interpreting services for the full training and suggested that Duran bring a friend or family member who could help her.  (EEOC SOF ¶¶ 24, 37–43; CN CASF ¶ 24, 37–43.)  The parties have also stipulated that "the accommodations requested by Rochelle Duran when she applied for employment with [Creative Networks] in April and May 2005 and the provision of an ASL interpreter to Rochelle Duran for pre-employment orientation and training would not have caused an undue hardship to [Creative Networks] pursuant to Sections 101 and 102 of the Americans with Disabilities Act, 42 U.S.C. § 12111(1) & § 12112(b)(5).  (Doc. # 96.)  The court has ordered that Creative Networks "will not assert an undue hardship defense or introduce evidence of undue hardship in this case, pursuant to Sections 101 and 102 of the Americans with Disabilities Act, 42 U.S.C. § 12111(1) & § 12112(b)(5)."  (Doc. # 99.)

15

Further, the EEOC points to deposition testimony by Neal and Creative Network's State Director Ron Cornelison ("Cornelison") that it was unreasonable for Creative Networks to limit its coverage of interpreter services to $200.  ("Neal Depo.," Doc. 125-9 at 29:15–17; "Cornelison Depo," Doc. 125-22 at 61:3–11.)  Cornelison also testified that Duran's request for a sign language interpreter was reasonable.  (Cornelison Depo. at 61:13–23, 62:3–6.)

Creative Networks has not come forward with any evidence creating a triable issue of fact as to whether it denied Duran a reasonable accommodation in violation of the ADA.  Indeed, in its Response to the EEOC's Motion for Partial Summary Judgment, Creative Networks conceded liability as to the EEOC's first claim.  Specifically, Creative Networks states that with respect to EEOC's "reasonable accommodation" claim pertaining to Duran:

> Defendant has subsequently acknowledged that despite the uncertainties as to whether Ms. Duran would ultimately complete all four steps of the process and actually ever come to work for the company, under the ADA it still could have and should have paid for and provided Ms. Duran with the ASL sign-language interpretation she was seeking as a reasonable accommodation for the first step of the process set forth above, the pre-interview/pre-hire training, with respect to the part-time second job position she had applied for.

(CN Resp. at 3.)  Accordingly, the Court GRANTS EEOC's motion for summary judgment as to its failure to accommodate claim with respect to Duran.

B.    <u>Failure to Hire</u>

The EEOC argues that Creative Networks violated the ADA by refusing to hire Duran because of the cost of providing her an interpreter.  (EEOC Mot. at 11.)  The EEOC specifically argues that Creative Networks' "refusal to reasonably accommodate Ms. Duran rendered her ineligible for hire, as it prevented her from attending and passing [Creative Networks'] mandatory training program."  (<u>Id.</u> at 11–12.)

Discrimination under the ADA includes "denying employment opportunities to a job applicant . . . who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant."  42 U.S.C. § 12112(b)(5)(B).  A plaintiff may establish a violation of the ADA by providing direct evidence of discrimination or making a prima facie showing of discriminatory intent.  <u>Daniel v. Boeing Co.</u>, 764 F. Supp. 2d 1233, 1240 (2011).  If the plaintiff produces sufficient evidence to make out a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision.  <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 803 (1973).  To prevail, the plaintiff must then produce evidence of facts that show the defendant's proffered reasons are a pretext for illegal discrimination.  <u>Id.</u>

at 804.

    To make out a prima facie case under the ADA, the EEOC must show that Duran was a qualified individual with a disability who suffered an adverse employment action because of her disability.  See Sanders v. Arneson Products, 91 F.3d 1351, 1353 (9th Cir. 1996).  As stated above, it is undisputed that Duran is disabled and that she was qualified for the Direct Support Professional position.  The issue in dispute by the parties is whether Creative Networks failed to hire Duran because of her disability.  However, it is undisputed that Creative Networks' application process required completing a training program and that Creative Networks would cover only up to $200 for interpreter services for Duran's training.  Moreover, as noted above, the Court has found, and Creative Networks has conceded, that Creative Networks denied Duran a reasonable accommodation during the pre-employment training.

    As a preliminary matter, Creative Networks asserts that the EEOC's motion does not even make the argument that Creative Works failed to hire Duran because of her disability but rather makes a "wholly irrelevant" argument that Creative Works did not hire Duran because of the expense in providing interpreter services.  (CN Resp. at 5.)  Creative Networks' assertion, however, fails because the Ninth Circuit has established that the "ADA outlaws adverse employment

18

decisions motivated, even in part, by animus based on a plaintiff's disability <u>or</u> <u>request for an accommodation</u>—a motivating factor standard." <u>Head v. Glacier</u> <u>Northwest, Inc.</u>, 413 F.3d 1053, 1065 (9th Cir. 2005) (emphasis added).

> Creative Works also argues that the EEOC's failure to hire claim fails because Creative Works never reached the stage of deciding whether to hire Duran. Specifically, Creative Works argues that applicants must complete the pre-interview/pre-hire training, and then an interview, before even being considered for a possible job offer. (CN Resp. at 4.) Thus, according to Creative Networks, because Duran never completed the mandatory pre-interview/pre-hire training, she was never in the position to be considered for or hired for the job. (<u>Id.</u>)

> The Court declines to adopt Creative Networks' stringent standard. As a general matter, a claimant is not necessarily required to complete every step of the application process—or even apply—when discriminatory hiring procedures deter her from doing so. <u>See</u> <u>Int'l Bros. of Teamsters v. United States</u>, 431 U.S. 324, 365–67 (1977) ("The effects of and the injuries suffered from discriminatory employment practices are not always confined to those who were expressly denied a requested employment opportunity. A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain

rejection.").

Neither is the EEOC required to show that Duran would have obtained the job if Creative Works had not acted unlawfully under the ADA.  See  Ruggles v. California Polytechnic State Univ., 797 F.2d 782 (9th Cir. 1986). Ruggles involved a Title VII claim for retaliation based on an employer's failure to hire the plaintiff.  797 F.2d at 785.  The Ninth Circuit determined that the plaintiff in such a case must show that the position for which she applied was eliminated or not available to her because of her protected activities, rather than show that, but for her protected activities, she would have been hired.  Id. at 785–86.  Therefore, the "'adverse employment decision' is the closing of the job opening to [the plaintiff] and the loss of opportunity even to compete for the position. The plaintiff need not show that she would have obtained the job, a showing that would be nearly insurmountable at the prima facie stage . . . ." Id. at 786.  Moreover, in a failure to hire case, the Ninth Circuit has indicated that it takes a broad view as to when discriminatory conduct takes place under the ADA.  See Zivkovic v. S. Calif. Edison Co., 302 F.3d 1080, 1090 (9th Cir. 2002) ("If, however, the interviews were conducted in a discriminatory manner without providing a reasonable accommodation, the interviewers' non-selection of [the plaintiff] would not be appropriate.").

As the EEOC argues, under Creative Networks' theory— that Duran is precluded from asserting a failure to hire claim because she did not complete every step of the application process—employers could discriminate and deny reasonable accommodations during early stages of the application process and avoid any liability for discrimination in hiring.  (<u>See</u> EEOC Reply at 9.)  In light of the aforementioned case law, the Court declines to follow such a principle.

Here, it is undisputed that the application process required completing a training program, and Creative Networks has conceded that it denied Duran a reasonable accommodation for the pre-employment training.  The evidence also shows that after Duran was denied a reasonable accommodation for the training, Creative Networks put her application in an inactive file.

Moreover, the EEOC further proffers the testimony of Rosemary Padilla, a Staff Development Administrative Assistant at Creative Networks, as evidence that Creative Networks did not hire Duran because it would cost more than $200 to provide an interpreter:

Q.   (By [EEOC counsel]) And what did Jen Hardine do to your
        knowledge?
A.   To my knowledge they came back and said that it was going to
        cost I think over $200 or something to hire her, for us, meaning
        the company, to get someone to translate for her.
Q.   And to your knowledge what did Creative Networks do in
        response to Rochelle Duran's request?
A.   They couldn't fulfill that request for her.  To my knowledge

they couldn't fulfill that request.

("Padilla Depo.," Doc. # 125-16 at 26:20–25 to 27:1–4.)

Creative Networks also asserts that the EEOC fails to present sufficient undisputed facts to establish a "failure to hire" claim under the ADA. (CN Resp. at 4.)  Specifically, Creative Networks argues that the EEOC premises its entire basis for partial summary judgment on a "single purported undisputed fact" and attacks the evidence—namely Padilla's deposition testimony—that EEOC relies on to support this purported fact.  (Id. at 4.)  For example, Creative Networks argues that Padilla was not a proper witness for this proposition because she was an administrative assistant with no decision-making authority.[2]  (CN Resp. at 4; CN CASF Ex. 2 at 16:20–19:10, 68:9–11.)

However, Creative Networks' characterization of the EEOC's argument as limited to one statement of fact is too narrow.   To support its failure to hire claim, the EEOC also points to a transcript of a conversation between Sankey and Duran, in which Sankey informed Duran that Creative Networks

---

[2] Creative Networks also argues that Padilla's testimony "more accurately addresses discussions about the company" providing interpreter services for Duran for the pre-interview/pre-hire training, "rather than any discussions regarding possibly later 'hiring' Ms. Duran after her potential successful completion" of the next step of the application process.  (CN Resp. at 4)  However, as discussed above, Creative Networks' argument that Duran's claim is precluded because she was never in the position to be considered for hiring fails.

would provide only $200 toward interpreting services for the training:

> RDuranclp:  Hi Eva, this is Rochelle. I am still interested and I show
> up for the training on Tuesday evening.  I understand that you will pay
> up to $200.00 dollars for the interpreter.  But, do you understand it is
> not enough for four hours training?  how will I be able to receive 24
> hours of training?  ga[3]
> My IP Relay:  I am sorry that is the company [policy] we pay the 200
> dollars for the full training class and if u have a family member or a
> friend that could help u with that just [inform] them that we will pay
> 200 dollars and call us back to schedule u for a training class
> . . .
> RDuranclp:   Even if it is $200.00 for one night of training, and it is
> still does not cover four hours training.  Also, to receive appropriate
> training through certified interpreters would be appropriate, rather
> than friends or family member ga
> My IP Relay:  like I said company policy because of the company
> policy we only take the 200 dollars for the 24 hours training
> My IP Relay:  ga
> RDuranclp:  well, I do not know what else to say but thank you bye
> bye ga or sksk
> RDuranclp: by the way
> RDuranclp: there is no one else
> RDuranclp: that could help translate for me
> RDuranclp: ga
> My IP Relay:  ok (WHILE U TYPED  (HUNG UP ANOTHER CALL
> QQ)
> RDuranclp: no and thank you by sksks
> My IP Relay:  GA  TNK U IP RELAY RO 1837M BYE SKSK

(EEOC SOF ¶ 39; CN CASF ¶ 39; Doc. # 125-19 at EEOC-CND-00024.)   The

evidence also shows that Hardin, upon the direction of her supervisor, advised an

---

[3] "GA" means "go ahead."  "SK" means "stop keying."  (Duran Depo. at 95:7–10.)

assistant who was in touch with Duran that Creative Networks would provide $200 for the cost of an interpreter and that the $200 did not include translating services for the orientation.  (Hardin Depo, 26:5–28:13.)

Based on the above evidence, the EEOC has demonstrated that Creative Works denied Duran an employment opportunity and that the denial was based on her need for reasonable accommodations.  Indeed, Defendant's failure to offer Duran reasonable accommodations foreclosed her opportunity for employment by preventing her from proceeding further in the application process. See 42 U.S.C. § 12112(b)(5)(B) (discrimination under the ADA includes "denying employment opportunities to a job applicant . . . who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant.").  The EEOC has met its prima facie burden, and the burden of production thus shifts to Creative Networks to articulate a legitimate, nondiscriminatory reason for the employment decision.  McDonnell Douglas, 411 U.S. at 803.  Creative Networks, however, does not present any nondiscriminatory reasons for its denying Duran employment opportunities.[4]  Accordingly, the Court

_____

[4]  Creative Networks appears to have conceded liability as to the EEOC's failure to hire claim.  In its June 5, 2012 Response to the EEOC's Supplemental Memorandum, Creative Networks states:

GRANTS the EEOC's Motion for Summary Judgment with respect to its failure to hire claim as to Duran.[5]

II.   Creative Networks' Motion for Partial Summary Judgment

Creative Networks moves for partial summary judgment against (1) the EEOC's allegations and claims for relief on behalf of the alleged class of similarly situated individuals, and (2) the EEOC's claims for injunctive relief.  (CN Mot. at 1.)  In its Motion, Creative Networks describes in great detail the procedural history of the case, complaining, inter alia, that the EEOC's Complaint makes vague allegations with respect to an alleged class of similarly situated individuals and that it was not until January 31, 2011—more than sixteen months

_____

[T]he only remaining evidentiary issues for trial in this case are monetary damages . . . as to Ms. Duran . . . in a case where failure to reasonably accommodate, and failure to hire, Ms. Duran (for a part-time second/ supplemental income job at a time when she already had a full-time job, and after which time she obtained an alternate part-time second/supplemental income job) have been admitted.

(Doc. # 145 at 5–6 (emphasis added).)
Creative Networks also separately states in the same brief that "[t]he only remaining evidentiary issues for trial in this case are (1) appropriate damages/relief, not liability, (2) on behalf of Ms. Duran only, not any class, relating to Defendant's failure to reasonably accommodate/hire Ms. Duran."  (Id. at 4 (emphasis added).)

[5]  In its Reply, the EEOC requests that the Court strike paragraph 59 of Creative Networks' Additional Statement of Facts.  (EEOC Reply at 11.)  Because the Court did not rely on this paragraph in deciding the EEOC's Motion, the Court denies the EEOC's request as moot.

after filing the Complaint and two months after the initial discovery deadline—that the EEOC first disclosed any alleged similarly situated class members.  (Id. at 1–4.)  Creative Networks also primarily bases its motion for partial summary judgment on the EEOC's communications to Creative Networks in October 2011 that it would no longer pursue relief on behalf of its six class members.

       In an email to Creative Networks counsel on October 18, 2011, the EEOC states that "[b]ased on Defendant's responses to the EEOC's discovery requests, we are not going to seek relief on behalf of" five of the individuals previously identified as class members, but that it would continue to seek relief on behalf of class member Christa Dondero.  (Doc. # 127-1 at 40.)  In an October 26, 2011 email to Creative Networks' counsel, the EEOC states that "after receiving Defendant's discovery responses and conducting the 30(b)(6) deposition, we are no longer seeking relief for Christa Dondero as a class member.  However, she remains a witness in the case."  (Doc. # 127-1 at 44.)

       On November 30, 2011, the EEOC filed a "Plaintiff's Notice of Non-Issues Concerning Class Claims," which states that it "no longer seeks monetary relief on behalf of a class of victims in this case" and that it continues to seek monetary relief on behalf of Duran and "injunctive relief relevant to all claims set forth in the Commission's Complaint."

26

A.      Allegations and Claims on Behalf of the Class

        Creative Networks moves for partial summary judgment against the

EEOC's class component of the case, "including any allegations and arguments by

the EEOC regarding, and requests and claims for relief by the EEOC on behalf of,

any class of similarly situated individuals or class members," such as:

> (i) any claims that Creative Networks failed to provide reasonable
> accommodations to a class of hearing-impaired individuals in violation
> of Section 102 of the ADA, 42 U.S.C. § 12112(a) or otherwise,
>
> (ii) any claims that Creative Networks failed or refused to hire a class
> of hearing-impaired individuals because of their disabilities in
> violation of Section 102 of the ADA, 42 U.S.C. § 12112(a) or
> otherwise,
>
> (iii) any claims that Creative Networks maintained any policy or
> policies with respect to its pre-employment orientation and/or pre-
> employment training that were in violation of the ADA and had the
> impact of not hiring or excluding a class of hearing-impaired
> applicants, and
>
> (iv) any claims that there was a class of hearing-impaired applicants
> who requested and were denied a reasonable accommodation by
> Creative Networks relating to their hearing-impairment with respect to
> Creative Networks' pre-employment orientation and/or pre-
> employment training based on any policy of, or practice by, Creative
> Networks of denying reasonable accommodations costing greater than
> $200 for interpreting services for hearing-impaired applicants, or
> otherwise.

(CN Mot. at 6–7.)

        In response to Creative Networks' Motion for Partial Summary

Judgment, the EEOC states that it does not contest the dismissal of class claims

and confirms that it has withdrawn its claims for relief on behalf of class

members.  (EEOC Resp. at 1–2, 7.)  The EEOC also notes that in November 2011,

it sent Creative Networks a proposed stipulation and order dismissing the class

claims.[6]  (Id. at 7; Docs. # 133-30, 133-31.)

However, the EEOC states that it opposes Creative Networks' "broad

summary judgment [request] which would, in effect, deny appropriate monetary

relief for Ms. Duran and appropriate injunctive relief in the public interest."

(EEOC Resp. at 7.)  The EEOC asserts that there are disputed questions of fact

regarding whether Creative Networks discriminated against other hearing-

impaired applicants and employees, and that testimony from such individuals is

relevant regarding Creative Networks' liability for punitive damages for Duran

and injunctive relief sought in the public interest.  (Id. at 8.)

Because the EEOC is no longer pursuing monetary or other

individual affirmative relief on behalf of a purported class of similarly situated

_____

[6] The Proposed Stipulation for Dismissal provides that the EEOC will
dismiss its claims for relief for class members in the case with prejudice.  It also
provides: "The EEOC will continue to seek relief for [Duran] with respect to all
claims and damages set forth in the EEOC's complaint.  The EEOC also continues
to list as witnesses some of the previously identified class members."  (Doc. # 133-
31.)

individuals, the Court dismisses the class claims for relief.  However, the Court denies Creative Networks' partial summary judgment motion with respect to the EEOC's claims and allegations that, <u>inter alia</u>, Creative Networks had a policy or practice of denying reasonable accommodations to hearing-impaired applicants that had the impact of not hiring or excluding such applicants.

As stated above, Creative Networks appears to rest its motion for partial summary judgment solely on the EEOC dropping "all allegations and claims for relief on behalf of any alleged class of similarly situated individuals[.]" (CN Mot. at 6.)  This argument fails.

First, the Court disagrees with Creative Networks' broad characterization of the EEOC's statements with respect to the class claims.  As stated above, EEOC's October 18, 2011 and October 26 emails state that the EEOC is no longer seeking <u>relief</u> on behalf of identified class members.  (<u>See</u> doc. # 127-1 at 40, 44.)  The emails did not indicate that the EEOC was dropping its allegations that, <u>inter alia</u>, Creative Networks had a policy or practice of denying accommodations greater than $200 for interpreting services.

Second, Creative Networks has not met its initial burden of "identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." <u>Soremekun</u>, 509

F.3d at 984.  As discussed above, Creative Networks' characterization of the EEOC's communications is overly broad.  Creative Networks has not otherwise identified any materials that demonstrate the EEOC's failure to establish a genuine issue of material fact as to the allegations that Creative Networks had a policy or practice of denying accommodations costing greater than $200 for interpreting services for hearing impaired individuals.

Third, the EEOC has proffered evidence establishing a genuine issue of material fact with respect to whether other deaf and hearing-impaired individuals were subjected to discrimination.  With respect to whether Creative Networks failed to provide reasonable accommodations to other hearing-impaired applicants, the EEOC points to Creative Networks' February 27, 2007 Response to Request for Information, which states that on December 11, 2003, Creative Networks advised a hearing-impaired applicant, Cecily Colle ("Colle"),[7] that she would be provided $200 for interpreting services.  (Doc. # 133-14 at 1.)  Creative Networks' Response continues to state that on January 21, 2004, Colle called and indicated that she still wanted to start training, but that as of February 19, 2004, Creative Networks had not heard back from Colle.  (Id. at 2.)  The EEOC also

_____

[7] The EEOC disclosed Colle as a witness, but did not include her in the EEOC's class.

submitted email communications between Hardin and Charles Leboda, a recruiter

for Creative Networks, with the subject line: "Cecily Colle." In a January 21,

2004 email, Leboda informed Hardin that Colle called and stated she is "still

interested." (Doc. # 133-15.) Then, on February 18, 2004, Hardin asked, "You

haven't heard from her? After you told her she'd have to pony up part of the $?"

Leboda responded on February 19, 2004: "Not a thing. She said she would look

into it and call back." (Id.)

The EEOC also submitted deposition testimony of Sankey that in

August 2006, she advised another hearing-impaired individual, Christa Dondero

("Dondero"), that Creative Networks would pay $200 for interpreting services.

(Doc. # 133-1 at 15:19–25, 16:9–25.) Although the EEOC acknowledges that

Dondero was hired by Creative Networks, the EEOC also points to a letter from

Dondero to Creative Networks dated August 17, 2010 in which she complains

about the lack of interpreter services for classes for CPR, first aid, or mandatory

meetings and refers to enclosed "information about ADA law that may help you

understand why I need the accommodation." (Doc. # 133-13.)

Finally, the EEOC points to deposition testimony of Megan Neal that

"[a]t some point Ron Cornelison and I discussed that we would pay $200. I do

not recall when that conversation was, if it was in relation to Rochelle Duran. It

was a general discussion about what we would do with people who had hearing

impairment and translators and the cost[.]"  (Doc. # 133-9 at 19:15–20.)  The

transcript of Neal's deposition testimony also suggests that Neal knew that the

costs for an interpreter would exceed $200:

> Q.  But you knew that Iraj Sohaei's interpreter had cost much more
> than $200?
> A.  I do believe I knew that, yes.
> Q.  Well, you had said before that you had paid thousands for the
> interpreter for Iraj Sohaei, correct?
> A.  I think it was in the thousands, yes.
> Q.  So you knew that the amount was actually much higher than
> $200?
> A.  Yes.

(Id. at 21:21–25, 22:1–4.)

Based on the above evidence, the Court finds a genuine issue of

material fact as to whether Creative Networks failed or refused to hire Colle

because of her disability by denying her reasonable accommodations.  The EEOC

has also demonstrated through the above evidence a genuine issue of material fact

as to whether Creative Networks maintained a policy with respect to its pre-

employment orientation and/or pre-employment training in violation of the ADA

and that Creative Networks subjected other deaf and hearing-impaired individuals

to this policy.

Accordingly, the Court dismisses the EEOC's class claims for relief,

32

but otherwise DENIES Creative Networks' Motion with respect to EEOC's

allegations regarding other hearing impaired individuals.

     B.   <u>Injunctive Relief</u>

          Creative Networks seeks partial summary judgment on the EEOC's

claims for injunctive relief prayed for in the Complaint, asserting that the EEOC's

remaining allegations and claims for relief now relate only to Duran and

represents at most an "isolated incident" that does not warrant an injunction.[8] (CN

Mot. at 7–8.)  Creative Networks asserts that "in light of the EEOC having

dropped all allegations and claims for relief on behalf of any alleged class of

similarly situated individuals, there is no abundant evidence of consistent past

discrimination."  (<u>Id.</u> at 8.)

          The EEOC asserts that Creative Networks' motion for summary

judgment regarding injunctive relief should be denied as premature because the

Court has not yet determined liability in the case nor determined appropriate

_____

[8] Creative Networks also argues that the allegations of Plaintiff's Complaint
form a "two-part action for relief" – an action for relief on behalf of Duran, and an
action for relief on behalf of a class.  (CN Reply at 3.)  Creative Networks further
argues that because the EEOC is no longer pursuing relief on behalf of a class, the
case is now reduced to simply a one-part action for relief on behalf of Duran. (<u>Id.</u>)
However, the Court construes the EEOC's Complaint as also seeking injunctive
relief in the public interest, independent of the relief sought for Duran and the
class.

damages.  (EEOC Resp. at 11.)  The EEOC also argues that, regardless of whether the EEOC seeks relief for class members, it may pursue injunctive relief "in the public interest" and that Creative Networks has not met its burden to prove that it will not engage in future discrimination.  (Id. at 12–15.)

If a court finds that an employer has "intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin [the employer] from engaging in such unlawful employment practice and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees . . . or any other equitable relief as the court deems appropriate."  42 U.S.C. § 2000e-5(g); 42 U.S.C. § 12117(a).[9]  In EEOC v. Goodyear Aerospace Corp., 813 F.2d 1539 (9th Cir. 1987), the Ninth Circuit stated that "Section 706(g) authorizes the EEOC to seek class action-type relief without complying with Fed. R. Civ. P. 23 [which provides for class certification], even when it only alleges

---

[9]  The Supreme Court and the Ninth Circuit have afforded the EEOC significant latitude in seeking various remedies as a means of vindicating the public interest.  "[P]ursuant to Title VII and the ADA, whenever the EEOC chooses from among the many charges filed each year to bring an enforcement action in a particular case, the agency may be seeking to vindicate a public interest, not simply provide make-whole relief for the employee, even when it pursues entirely victim-specific relief."  E.E.O.C. v. Waffle House, Inc., 534 U.S. 279, 296 (2002).

individual acts of discrimination." <u>Id.</u> at 1543.  Upon a finding of any intentional employment discrimination, a district court possesses broad discretion to craft an injunction that will ensure the employer's compliance with the law.  See <u>Bouman v. Block</u>, 940 F.2d 1211, 1233 (9th Cir. 1991).  "Thus, the EEOC may obtain such general injunctive relief, under the equitable discretion of the district court, even where the EEOC only identifies one or a mere handful of aggrieved employees." <u>EEOC v. Frank's Nursery & Crafts, Inc.</u>, 177 F.3d 448, 468 (6th Cir. 1999); <u>EEOC v. Ilona of Hungary, Inc.</u>, 108 F.3d 1569, 1578 (7th Cir. 1997);  <u>EEOC v. Harris Chernin, Inc.</u>, 10 F.3d 1286, 1292 (7th Cir. 1993).  The "EEOC may seek injunctive relief to correct discrimination uncovered during its investigation of the charge of just one individual.  The EEOC may obtain a permanent injunction even where it does not allege a pattern or policy of discrimination." <u>Frank's Nursery</u>, 177 F.3d at 468.

The EEOC may seek injunctive relief in the public interest.  The EEOC "is not merely a proxy for the victims of discrimination," but "acts also to vindicate the public interest in preventing employment discrimination." <u>General Tel. Co. v. EEOC</u>, 446 U.S. 318, 326 (1980); <u>see</u> <u>also</u> <u>Goodyear Aerospace Corp.</u>, 813 F.2d at 1542–43 (holding that the EEOC may seek injunctive relief even after the individual charging party reached a settlement with her employer); <u>Harris</u>

35

Chernin, Inc., 10 F.3d at 1292 ("To make a case for injunctive relief, the EEOC

may not need to produce evidence of discrimination beyond [the individual

charging party's] case." (citing Goodyear Aerospace Corp., 813 F.2d at 1544

(EEOC entitled to injunction if it proves case involving discrimination of one

employee and where employer fails to prove violation not likely to recur))).

      An employer may avoid an injunction by showing that "there is no

reasonable expectation that the wrong will be repeated," that is, that the issue or

claim is moot.  United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953); see

also EEOC v. Hacienda Hotel, 881 F.2d 1504, 1518-19 (9th Cir. 1989); Goodyear

Aerospace Corp., 813 F.2d at 1544.  However, the burden of showing no

reasonable expectation of repeating the wrong is high.  See W. T. Grant, 345 U.S.

at 633.  Generally, victims of employment discrimination are entitled to an

injunction against future discrimination unless the employer proves it is unlikely

to repeat the practice.  See Hacienda Hotel, 881 F.2d at 1519; Goodyear

Aerospace, 813 F.2d at 1544.

      "Permanent injunctive relief is warranted where . . . defendant's past

and present misconduct indicates a strong likelihood of future violations."

Orantes-Hernandez v. Thornburgh, 919 F.2d 549, 564 (9th Cir. 1990).  Evidence

relied on to show a cognizable danger of recurrent violation should not be "stale"

or too far removed from the present.  See Webb v. Missouri Pacific Railroad Co.,
98 F.3d 1067, 1068–69 (8th Cir. 1996)  (holding that past conduct cannot support
an injunction issued five years after the close of evidence).  In making this
finding, the court may consider "the degree of scienter involved; the isolated or
recurrent nature of the infraction; the defendant's recognition of the wrongful
nature of his conduct; the extent to which the defendant's professional and
personal characteristics might enable or tempt him to commit future violations;
and the sincerity of any assurances against future violations."  United States v.
Laerdal Mfg. Corp., 73 F.3d 852, 854-855 (9th Cir. 1995).

      The Court denies Creative Networks' Motion.  First, the Court finds
that Defendant's Motion is premature because Creative Networks' liability with
respect to the EEOC's claim that Creative Works maintained a policy that was a
per se violation of the ADA has not been resolved.  Upon reviewing the parties'
supplemental briefs regarding the EEOC's policy violation claim, the Court finds
that this claim remains relevant particularly as to the Court's shaping of any
appropriate injunctive relief.[10]  Because liability has yet to be determined as to this

_____

    [10] Because the Court finds that the EEOC's policy claim is relevant as to
injunctive relief, an issue in the instant motion, the Court does not express an
opinion at this time as to any bearing that the EEOC's policy claim may have with
respect to punitive damages.

claim, ruling on injunctive relief would be premature.  Moreover, as stated above, the Court has found that Creative Networks violated the ADA with respect to Duran, and Creative Networks has not carried its burden of proving that it is unlikely to repeat the violation of denying applicants reasonable accommodations. See Goodyear Aerospace Corp., 813 F.2d at 1544.  Even if no other charges existed, that does not suffice to show that future violations are unlikely.  Hacienda Hotel, 881 F.2d at 1519 (finding the district court did not abuse its discretion by awarding permanent injunctive relief even in the absence of further EEOC charges).  Further, the Court has found that a material issue of fact exists as to the EEOC's claims with respect to allegations that Creative Networks engaged in an unlawful employment practice as to at least some of the EEOC's witnesses.

Accordingly, the Court DENIES Creative Networks' Motion for Partial Summary Judgment with respect to injunctive relief.

In its Reply, Creative Networks argues for the first time that injunctive relief in the public interest is only available to the EEOC in a Section 707 "pattern or practice" case, and that the EEOC's Complaint is based on Section 706, which pertains to relief for aggrieved individuals.  Creative Networks asserts that the EEOC is impermissibly attempting to insert a new, unpled Section 707 "pattern or practice" legal theory into the case by stating in its response that it is

38

seeking an injunction in the public interest as well as on behalf of Duran.  The

Court does not consider arguments raised for the first time in a reply.  See Graves

v. Arpaio, 623 F.3d 1043, 1048 (9th Cir.2010) ("[A]rguments raised for the first

time in a reply brief are waived").[11]  In any event, Creative Networks' argument

fails because the Ninth Circuit and other courts have found that the EEOC may

obtain general injunctive relief in § 706 claims.  See Goodyear Aerospace Corp.,

813 F.2d at 1544; Frank's Nursery, 177 F.3d at 468 ("The EEOC may obtain a

permanent injunction even where it does not allege a pattern or policy of

discrimination.").[12]

          Creative Networks also argues in its Reply that none of the three

alleged witnesses by the EEOC[13] were deposed or shown to be similarly situated

class members.  (CN Reply at 7.)  Whether the witnesses were shown to be

similarly situated class members is not relevant, as the EEOC is no longer seeking

_____

        [11]  The Court does not consider Creative Networks's new argument in its
Reply with regard to "Plaintiff's actions in failing to investigate, make a reasonable
cause determination on, and conciliate, the class allegations during the EEOC
administrative investigation phase[.]"

        [12]  The cases that Creative Networks cites in its Reply do not support its
argument that injunctive relief in the public interest is only available to the EEOC
in a § 707 "pattern or practice" case.

        [13]  The witnesses Creative Networks specifically referred to are Colle,
Dondero, and a third witness, Sherri Acero.  Creative Networks notes that it hired
Dondero, Acero, and two other previously alleged class members.

relief for them as class members.

Creative Networks also argues that Dondero is an improper witness because the EEOC disclosed her as a class witness rather than as a witness for its non-class case. (CN Reply at 7–8.) Creative Networks asserts that once the EEOC chose to withdraw its class case, all "solely class case witnesses" such as Dondero were thus also withdrawn. (Id. at 8.) The Court notes, however, that its finding that there was a genuine issue of material fact as to allegations with respect to Dondero were not based on Dondero's testimony, but on Sankey's deposition testimony as well as a letter that Dondero wrote to Creative Networks. The issue of the propriety of the EEOC's witnesses, raised for the first time in Creative Networks' Reply, will not be decided here. Should Creative Networks continue to seek to exclude the testimony of certain witnesses, it may do so by filing a motion in limine.

<u>CONCLUSION</u>

For the reasons set forth above, the Court GRANTS EEOC's Motion for Partial Summary Judgment (doc. # 124) and DENIES Creative Networks' Motion for Partial Summary Judgment (doc. # 126).

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, September 19, 2012.

_____
David Alan Ezra
United States District Judge


Equal Employment Opportunity Commission v. Creative Networks, L.L.C., Cv. No. 09-02023 DAE; ORDER:  (1) GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND (2) DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT